Thank you, Your Honor. I'm Paul Dayton, Counsel for the Confederated Tribes of the Colville Reservation. I have with me at Counsel Marty Rapp, who is in-house Counsel for the Tribes, and also Andy Fitz, who is Counsel for the State of Washington. I would like to reserve three minutes for rebuttal. Okay, please watch the clock. It's your responsibility. But if I see you're going past, I'll try to remind you if I can. Thank you. May it please the Court. We represent the Confederated Tribes of the Colville Reservation, a group of 12 tribes whose reservation borders on the upper Columbia River in northeastern Washington. They have lived there and hunted and fished its land and waters since time immemorial. This case arose because Teck Metals operates a large smelter upstream from the reservation and, for most of the 20th century, dumped its smelter wastes in the Columbia River, where they flowed downstream and settled in the river where the Colvilles live. The District Court found that Teck used the upper Columbia River as a free disposal facility for its wastes, and the District Court also found that it dumped more than 10 million tons of slag and 200 tons of mercury in the Columbia River. Resulting releases of hazardous substances make Teck liable, as a responsible party under CERCLA, and liable for damages for injury to and destruction of natural and loss of natural resources. The question presented for the Court today is whether the District Court erred in dismissing the Tribes' natural resource damages claims asserted against Teck under CERCLA, specifically lost interim use of injured resources. The District Court was wrong. It misunderstood the claims alleged as targeting cultural resources rather than injured natural resources as expressly authorized in CERCLA. Consequently, the Court failed to apply applicable statutory and regulatory text, as well as applicable circuit case law. Correctly applied, the relevant authorities conclusively demonstrate that the District Court's decision must be reversed. In my comments today, I will explain that the relevant framework for the Colvilles claim is well established. Our brief, along with the amicus curiae brief of the United States, describe this in detail. But it can be succinctly summarized here. Section 9607AC authorizes recovery of natural resource damages. Section 9607F1 authorizes the Federal Government, States, and Tribes, acting as natural resource trustees, to recover such damages, and such damages are not limited to the sums that may be used to restore or replace such resources. The alleged natural resource injury here, toxicity to benthos, creatures that live in the sediment, and mercury-based fish advisories due to releases of mercury from Tex metals, the Tex discharges, and the mercury-based fish advisories due to releases of mercury from Tex metals,    that the Colvilles were alleging injury to cultural resources, and it couldn't find cultural resources in the definition of natural resources that's encircled. So it was off-target from the beginning because, in fact, the Colvilles allege injury to natural resources, and the benthos and the fish advisories are well within the definition of Section 11.14. So the question then becomes, so natural resource injury is established. The question then becomes what damages result from that. And there is the typical cost of restoration that results from that. But there's also, as I will explain as I go through my remarks, recovery of lost use. And lost use encompasses a variety of things. In this case, as I'll explain as we go along, two out of the three forms of damages don't have any cultural component at all. So the trial court was just off-target in characterizing those as cultural injuries. The lost river use claim is just a typical lost use to the river claim, like many brought across the country. There's no cultural aspect of that. The reduced total value of the river, which is measured by a contingent valuation study, that's the second form of damages that's alleged here by the Colvilles, that's a standard methodology authorized by the regulations and recognized in the State of Ohio to take account of the non-use or existence value of a contaminated resource. That's not cultural either. It's just a reduced value of the resource and its method of calculating what that loss is. There's a cultural component, though, right? I mean, the tribe has a connection to the river that's a little different than me growing up in Kennewick on the river. Absolutely. Everyone has a different attitude toward resources, and the Colvilles certainly value natural resources more than some. But that's inherent in anyone's judgment of the lost value of a resource. It doesn't make the loss cultural in and of itself. The third form of damage that's sought here is indeed avoidance of the river, reduced cultural use of the river based on contamination of the river. That is directly a cultural loss, and that cultural loss is recoverable under State of Ohio. State of Ohio gives pretty clear guidance to the court of the broad reach of CERCLA to recover all damages resulting from the release. There's no limiting language in there, and there's certainly no limiting language anywhere in CERCLA that suggests that cultural loss should not be recovered. So the short answer is the trial court was wrong in how it framed the claim, but it was also wrong in concluding that cultural loss does not come within the meaning of use within the statute. Let me return. Could I intervene here? So when you talk about your last point about cultural use, it has to be tied, though, to the natural resources loss. Is that correct? Yes, it has to result from the framework of damages here is natural resource injury and the resulting damages because of loss of use of those natural resources. So you have to look at each of the claims here and ask, are they anchored in injury? And the fairly straightforward answer is yes. In the case of the reduced fishing claim, it's directly tied to the fish advisory. That's why they don't fish as much. So it's directly tied to the injury that's in question. The lost total value claim based on a contingent valuation study is also directly tied to the injury in question. And we see that when you look at how the study was done. The study that forms the basis for the contingent valuation asked the tribal members how much whether they would exchange forest land for a contaminated river, but not just a contaminated river as tech would suggest. A contaminated river that resulted in injury to benthos, toxicity to benthos, so that you can see that the study that was done was directly linked to the injury that's at issue in this case. And the tribes were called upon, the members were called upon to identify the value, reduced value of that river with that injury, the actionable injury in this case. It's only when we turn to the third form of damages, which is the reduced cultural use of the river, that the question starts to get more interesting. In the case of reduced cultural value, tech has spent many, many pages saying it's just perception. They're just guessing that there's been injury in the river. But that's an interesting trial argument. That's not, on summary judgment, that's not the record in this case. On summary judgment. Let me ask you, the district court seemed to have made a legal determination here. That is that these cultural lost uses just aren't within the scope of this statute. But let me ask you this. So if you read the three reports, is it not possible that the district court could have said, look, I've read these reports, and the damages you envision are just too speculative as a matter of law. Therefore, I'm going to grant summary judgment for tech. He didn't do that, right? No. But if Your Honor's question is could he have done that, well, to start with, Your Honor, he would have had to review the record, which he didn't do. If he had reviewed the record, and I won't run back just what I just described, but certain parts of the claim are obviously not cultural. The reduced river use, which is calculated by taking a study of how much the cobbles used to use the river, how much they use it now in light of fish advisories, that's calculating how much are you using it less. And that's no different than the general public's claim for lost fishing use. So it doesn't have a, you can't say that the fishing reduction is somehow a cultural loss that might be outside the scope of CERCLA. It's actually squarely within the scope of CERCLA. So you then have to turn to the lost total value claim, which is expressly authorized in the regulations. And while the contingent valuation approach to it is expressly authorized in the regulations and it's affirmed or its application is endorsed by the State of Ohio, and that's calculating how much is this river worth less because it's contaminated. And not just contaminated, but contaminated in a way that causes the creatures in the sediment to die. How much less is it worth because of that? And that's a fairly standard, Your Honor, approach to valuing damage to resources. It was done in Deepwater Horizon. It's done elsewhere. It's a way to get at what the State of Ohio described as the existence value of a resource that's been injured. And I gather if the case were to go to trial, or this part of the case were to go to trial, the experts' reports or their methodology would be front and center. Oh, absolutely. We have two distinguished economists who have an opinion on this. I have to say an expert case in response is pretty thin, but it will go to trial with experts explaining the basis for the studies that were done. And to be fair, and I'm sure Your Honor knows this, contingent valuation studies have had their share of criticism over the years, and people argue over whether they accurately predict. And the answer to concerns about that, and this is what State of Ohio says, the E.C. Circuit says, is it can be. The devil is in the details. You just have to look at the particular study in question, and you really, frankly, have to look at the questions that are in the study that allow you to determine whether you think it's a reliable treatment of the lost value. But before you run out of time, which I'm about to do. You have this contingent valuation for existence value, but you're asking for something that sounds more like a restorative justice program. How are you connecting the remedy to the damages? Well, Your Honor, I should be clear about this. We've proposed three forms of damages. We have explained, though, they're alternate, especially the second and third. They're not to be combined together. So the trial judge is ultimately going to have to decide how to do justice here, and those claims will be in front of him as a way to do that. All right, then. I've arrived at my three minutes, which I reserve for rebuttal. I'll save them and come back in a few minutes. Thank you. Counsel.  Page. Good morning, Your Honors, and may it please the Court. My name is Ann Voights, and I represent Tech Metals. The district court here correctly granted summary judgment on the Colville Tribe's claim for cultural resource damages, and those claims fail for two independent reasons. First, the only cause of action on which plaintiffs can proceed is one that Congress created, not that plaintiffs have come up with, not that the agency created, not that courts can craft after the fact. And CERCLA does not provide for cultural losses or for cultural restoration. It provides for natural resource damages and for natural resource restoration. Counsel, what about damages for damage to a natural resource that has some cultural impact or component? I think, Your Honor, first we need to take a step back and look at what the actual natural resource damages are here, and for that I'd say look at what plaintiffs themselves have said. They have two alleged injuries here. Because of this Court's prior decision, right, it isn't simply the slag. It has to be the leaching and the impact on the benthic macroinvertebrates, on the one hand, or mercury and fish tissue. Those are the only two natural resource damages that are at issue here. But time and time again, when you look at the way that they've framed their models, they've framed their models in terms of the river as a whole. But the river as a whole is not the natural resource that's damaged, and none of their studies focus on, or their experts focus on, the benthic macroinvertebrates or the fish specifically. And that fundamental failure is sort of a threshold issue for their claims here, and it's another reason why the Court was correct to grant summary judgment here. Okay, Counsel, I have a question for you. Certainly. I thought your briefing didn't discuss in any detail the statutory section in 42 U.S.C. 9651 C.2. And I wanted to ask you what's your view of the significance of that section? I don't know if I could have a moment to pull that up. So 9651 C.2 authorizes rulemaking. It says the regulation shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction or loss, and shall take into consideration factors including but not limited to replacement value, use value, and ability of the ecosystem or resource to recover. Counsel, wasn't that done here in the promulgation of applicable regulations? No, I think, Your Honor, if the Court were to look at the applicable regulations here, one, plaintiffs are hanging their hat on a preamble, which DOI has previously said is not actually the rule. It is simply the language in the preamble, which is not binding, nor should it be here. Second, it misunderstands the basic purpose of CERCLA. We think that the regulations cannot themselves create an independent cause of action. They can only implement the cause of action that Congress has created. But aren't the regulations pertinent to the interpretation of the term natural resources? Well, I think, Your Honor, under Loper-Bright, they cannot go beyond what the statute actually provides for. And here I actually think if you look at the interior regulations, for example, it talks about use value. And it says it's the economic value of the resources to the public that are attributable to the direct use of the services provided by the natural resources. And again, the natural resources here are the benthic macroinvertebrates or the fish. But when you look again at the sort of three models that they are talking about here, let's start first with the cultural restoration program. That, for example, none of that is tied to either of those two injuries. Those are, to Judge Piazza's point, those are purely speculative. They go to issues about language learning and things that may be independent goods but that are not actually caused by the natural resource damages here. To go this far would essentially open Pandora's box to any claims, particularly ones that here truly are based on perception. And that goes to the- But did you look at footnote 70 in Ohio where the example they give for non-consumptive values, existence values, they go, for example, an individual who does not plan to use a beach or visit the Grand Canyon may nevertheless place some value on the preservation of the resource and its natural state for personal enjoyment in the event they may later change their mind. I mean, that is speculative, but it seems like that's the kind of valuation method that Ohio sets forth. And I'm not sure how you're getting past Ohio here with these existence values. Sure. Well, if I could address that. First, the question is which natural resource. So, again, that comes a cropper of the fundamental issue with this particular case. Beach, the Grand Canyon. I mean, those are big natural resources. Correct. But the natural resources that are at issue here, because of the limitation that this court previously imposed when it said this isn't about slag. So it's not about slag on beaches. It's about the leaching of the contaminants that happens gradually over time. And it's effect on two things here, benthic macroinvertebrates and fish. And so you have to have that tie. But what they have proposed is something that is writ much larger that depends on contamination in the river. And if I could address a point that my colleague on the other side made when he was talking about the survey, the survey wasn't limited to benthic macroinvertebrates. It talked about contamination in the river, and it talked about potential harm to animals. While it did mention things like benthic macroinvertebrates, that was an example, not as a limitation. And so that survey as well suffers from the fundamental problem that you have to have a causal nexus between the alleged harm, the natural resource damages, and then what they are seeking to recover. Because the fundamental purpose of CERCLA is not to provide a windfall. It is to restore and replace natural resources. Isn't it natural? I find this argument a little bit hard to follow because isn't it the natural resource damage to the river? At bottom? I mean, it seems like you're just splitting hairs here. No, I think with all due respect we are, and if the court looks at the way that the term is defined, the term is defined in terms of this sort of specific resource. And there isn't an issue. If you look at the river overall, the water, for example, is safe to drink. The fish is subject to a mild fish consumption advisory. That is very different from the issue here, which is really focused. Is that the case for the last 100 years or whatever it is, as long as tech has been discharging into the river? Well, the fact is that there were fish consumption advisories before there were any fish advisories related to mercury. There were fish consumption advisories for other things. And so, again, I think the question is what can actually be attributable fairly to the natural resource damages alleged here. The ones that plaintiffs themselves concede are at issue. They say, and if you look in their reply brief, they specifically say they have to show that there were injuries to benthic macroinvertebrates, that there were injuries based on the fish consumption advisory to fish. And based on that, they have to show that the damages flow from that. That is not what they have done here, and it's not something that is cognizable under CERCLA. Counsel, why isn't that question you're raising, apart from your very last clause, the question of what injury there is, why isn't that a question for the district court, which kind of made short shrift of the claims, and as I understand it, based on its legal interpretation, it does not make factual findings about damage. It reached a legal conclusion, which was the basis on which this court granted interlocutory appeal, but this court can affirm on any basis supported by the record. And to Judge Paez's comment, this is certainly one where the court could have, and in fact, it would have been entirely warranted in concluding that the theory here was too speculative as a matter of law to support proceedings. Essentially, I'm sorry, go ahead, Your Honor. We could affirm on the ground supported by the record, but that ground would be totally speculative when the court didn't say that. I think, Your Honor, if the court looked at whether cultural damages were cognizable under CERCLA, it correctly concluded that they weren't, that that was a road too far. The language of the statute itself is clear. It talks about natural resources, but when you look time and time again at how plaintiffs framed their claim below, they framed it as cultural resources, they framed it as cultural harm, and what they were talking about was not actual natural resource damages, but perceptions about natural resource damages. If you look at SER 889, you see their own experts said it's the perceptions about the contamination that creates a large range of cultural losses. But doesn't, isn't that what Ohio addresses when it talks about non-use damages? It's talking about perceptions in the enjoyment of the natural resource. I would say, one, the perception, non-use is not in the statute itself. Second, I think if you look at Ohio, Ohio talks specifically about the fact that Congress intended damages to be compensatory, not punitive. It talked about, in looking, for example, at the committed use criterion, that what you were looking at is you were looking for things that are not speculative. You were looking for things that are reliably calculated. You were looking at things that actually flow from these harms, and the sort of things that plaintiffs have advanced here simply aren't. Well, they put forward a contingent evaluation that you disagree with, but that's speculative but authorized by Ohio, right? The model may be authorized, but that is a different question from whether, as presented here, it's a valid method, and it isn't. Well, but isn't that for the trial court to decide? I think, Your Honor, the trial court's decision here was correct, both as a matter of law, but it's also supported alternatively by the fact that these claims simply don't hold up, that either, as a matter of law, simply is there such a claim writ large, or is the claim that they have stated here sufficient, even if you disagree with me on the first point? They have to prevail on both. We think that they can prevail on neither. Counsel, I'm going to apologize for using up some of your limited time, but I'll give you a few extra minutes at the end if you need. Thank you. I have several questions about the State of Ohio case. Sure. My first question is, is there any reason that you have why our court should not consider the District of Columbia Circuit's opinion in the State of Ohio? So this court can certainly consider it for its persuasive value. We think, actually, Ohio helps us here, and if I could explain why. First, the question in front of Ohio was, and it said specifically, we're not asking a larger question about how to calculate damage. They say, is DOI entitled to treat use value and restoration cost as having equal presumptive legitimacy as a measure of damages? It actually said no. It said that the thing that really drives CERCLA, CERCLA unambiguously mandates a distinct preference for using restoration cost as a measure of damages. And so it said, while you could consider in some circumstances use, the paramount purpose of CERCLA is restorative, but that is not restoring the natural resources, is not the focus of plaintiff's claims here. In fact, if you look at what CCT said below, they conceded that its avoidance of the river is based on contamination of the river and not specifically the injury it's contamination caused to benthos. That's at 2 ER 118. And they said the pathway for injury to human uses does not need to mirror that of benthic invertebrates. That's at SCR 132 and 33. But it does. There isn't sort of a free-floating right to recover damages that isn't tied to the actual natural damages or the natural resource damages that we are talking about here. And those are very specific in part because the extraterritoriality concerns that this court dealt with previously. And so, again, looking at this, the court has to consider what the actual natural resources are. And I don't think it is splitting hairs at all to say that it has to focus. The plaintiffs themselves have conceded. It has to focus on the BMIs. It has to focus on the fish. And if you do that, that ends the inquiry there. Counsel, I also have a question on the state of Ohio. I thought there that the court held that Congress intended the damage assessment to capture fully all aspects of injury. Well, it actually noted there that Congress had rejected the premise that common law measure of damages was appropriate. And it said when you were looking at this, for example, it said there's a concern with unreliable assessment. They were concerned about speculation. They wanted things that were actually provable. And the sort of claims that are being advanced here simply don't meet that standard. So, again, we don't think Ohio is bad for us. We don't back away from it. We think that its language about the fundamental purposes of CERCLA and its limit and its focus, which is on the natural resources, is entirely applicable here but doesn't compel reversal at all. We think it supports affirmance in this case. And I think I'd like to, if I could, I'd like to say, when we're talking here, you know, the fundamental issue is that this is speculative. It isn't tied to the natural resources. And when you're talking about, as Your Honor pointed out, the connection between the damages and the remedy, there has to be one, even though plaintiffs have disavowed that. And that is a fundamental gap here that we just don't have. Isn't it a fundamental gap for the trial court to determine? I mean, you're asking the appellate court to determine what could have happened if there hadn't been this legal conclusion to end the inquiry. Well, we think that this is also a legal conclusion. We think that on summary judgment, a court is entitled to look and see if there is sufficient evidence. We think that there is not. And we think that as framed as a legal matter, the claim fails both, as we said, broadly, but also as framed in this particular case. We think that that is. I have a, Judge Gould, if I may. Certainly. I just have a question I'd like to follow up on here, which is this. So as I understand part of the plaintiff's theory or their claim, they claim they have not used or there's been diminished use of the river with respect to fishing, to fish, or enjoying the river for fishing purposes, and that like the general public, well, it's similar to the general public's claim, but because of the tribe's connection to the river, there's a greater loss to the tribe. Now, that may have some cultural aspects to it, but it seems to me it could also easily fall within the notion of an indirect loss. And I fail to see why that could not or should not be, you know, a tribal issue of fact that the court has to resolve. Well, Your Honor, first and foremost, that goes to the sort of third component, right, the fishing component. And we say the fundamental problem with that is that they have stated a claim both as part of the joint claims and separately as part of this, with no effort to reconcile the two. And CERCLA explicitly prohibits double recovery. The two other methods that they have, one is the cultural restoration plan that they talked about with the building of the longhouse with language barriers. I understand that. And then there's separately the contingent value survey, which again isn't tied to the specific harms here and is writ large about contamination in the river. Well, my question was to the first point, which is that it seems to be that that's a task for the district court. I mean, figuring, sorting out any added damage for loss of use of the river. Your Honor, I think the plaintiffs have yet to articulate a way in which those can be why the joint claim doesn't in fact incorporate those additional values or why it isn't divided appropriately and why it isn't duplicative. And we think that that is sufficient on that particular claim. But even if this court disagrees with us on the fishing model, we think that there are entirely valid reasons to affirm the grant of summary judgment as to the other two models, the contingent value survey and then Alfred, the cultural restoration plan, neither of which are tethered in any meaningful way or demonstrate the requisite causation. With that, I see that I'm out of time. I'm certainly happy to answer. Counsel, although your time has been used up, I have a question about this issue you raised in your last few comments about duplication of the damages in the joint claim. So my question is this. If there is a group of people who live on the shores of the upper Columbia River, they're right next to the river, adjacent to it. Is the nature of their claim or the amount of their damages that can be caused by injury to the river different than the claim of someone in the state of Washington who lives far, far away from the upper Columbia River? Yes, Your Honor, I think it does differ. And in this case, the particular sites of contamination aren't actually, they don't actually abut the reservation. In this case, they are significantly north of that. So we do think that there is sort of gradation and nuance. We think that that is missing in all of the models that plaintiffs have advanced here. And again, we think that CERCLA is not a free-floating basis for broad recovery. And the plaintiffs have failed to establish either as a matter of law that they are entitled to recover under the statute. With that, I see that I'm out of time, if I may. Thank you, Counsel. Thank you, Your Honor. Now we'll hear from, further from Appellant. And Counsel, you've got your three minutes that you reserved. And in addition, because the appellee went over time, if you need an extra minute or two, we'll add that to your time. But don't use it if you don't need it. Thank you, Your Honor. Your Honor, let me turn first to the issues that need to be tried in the district court and weren't addressed on summary judgment in the first place. Counsel has suggested that the fishing, reduced fishing claim, is somehow duplicative of the general claim by the public. That's not an issue on which Tech moved in the trial court. There's no record on that subject in the trial court. I will say, though, we have provided a record from our expert witness in which he says that it's not duplicative, that it is, in fact, he says there's a maximum of 5% overlap between the claims. And the claims that he has calculated are distinct from the general public. Counsel probably disagrees, but that's an issue of fact for trial. The second component of damages is the contingent valuation study. Tech also, and we've heard some comments about how counsel thinks that's not adequately linked to benthic injury. Counsel didn't argue that in the district court, and consequently the district court did not analyze that question. It is, in fact, counsel has insisted it's not linked. Well, it is, and the is-isn't is what we have trials about. It is linked because the questions put to the members of the tribe specifically said assume that there's contamination of the river that results in injury to benthos living in the sediment. That injury is the basis for the valuation that goes on. Now, counsel may quibble about there may be other considerations, other parts of the question that counsel doesn't like, but that kind of disagreement about what do you make out of that contingent valuation study is a matter for trial, and it certainly wasn't addressed in this motion. Finally, the cultural injury, third claim, the avoidance based on the contamination of the river. Once again, counsel, Tech, cites lots of snippets of evidence from one witness or another that says something about whether some perception that counsel argues isn't sufficient. But there's countering evidence on that. We didn't have, we haven't had a trial on that, but we have offered evidence, our expert testimony that says, according to Dr. Alfred, that the injury to the natural environment that's at issue here, the injury to the benthos, is the basis for the cultural avoidance. Now, counsel may disagree and say that's not persuasive, but that's an issue of fact. That's a clash between the various testimony, and that issue of fact has to be sorted out at trial. I will observe that it's not obvious, as counsel suggests, that the injury has to be directly linked to the, I'm sorry, that the damages have to be directly linked to injury. It's a matter of economic analysis, and Dr. DeMasti explained this. In most causes of action, the damage has to flow from the wrongful act, but it doesn't necessarily have to flow from the injury in question. And we gave your honors authority on that from a number of state court decisions. There's not a circular case law on that, and so that's a subject that hasn't been fully examined. But it is not, I just want to leave it at this, it's not a given that the damages have to be specifically linked to injury, that they can also be linked to contamination itself, and that's what Dr. DeMasti explains in his testimony. Let me briefly mention Loeb or Bright. It doesn't offer any difficulty here because the statute specifically provides for the lawsuits sought. But more importantly, the D.C. Circuit, doing exactly what Loeb or Bright requires it to do, interpreted the statute and explained how that should be applied here and gave this court the groundwork to rule in favor of the plaintiff. Let me also mention on the subject of whether this court ought to consider the comments from the D.C. Circuit. It goes without saying that it's persuasive authority, but the court's also aware that CERCLA specifically provides that the D.C. Circuit is charged with interpreting the regulations in question. So that's what it's done here, and I think that gives some reason for the court to give particular consideration to what the circuit has said. Let me finally say that counsel suggested that plaintiffs rely only on the preamble of the regulations as a basis for the identification of the relevant regulatory principles. That's not the case. I'm not sure we've cited it. We've provided the court extensive review of the statute, regulations, and case law, and that's what we rest on. And I will say the United States made the same explanation on the same principles, and I think those guide this court. Thank you. Thank you, counsel. This case concludes. I will now ask the clerk to show this case as having been submitted, and the parties will hear from us in due course. It's a challenging case, and I want to thank counsel for both the appellant and for appellee for your excellent arguments. The court would not be able to decide these cases without the assistance of counsel's advocacy, and we very much appreciate it. With that, this case is submitted. Thank you. All rise.
judges: GOULD, PAEZ, McShane